Hear ye, hear ye, hear ye. The United States Court of Appeals for the 11th Circuit is now open according to law. God save the United States and this honorable court. Good morning. We have four appeals to hear this morning. Council, we're familiar with your cases. We've read your briefs, the authority cited in your briefs, and at least portions of the record. So you have limited time this morning. Feel free to go straight to the heart of your argument. Whatever you've addressed in your brief that you're not able to discuss with us this morning will of course still be preserved. We're probably going to have some questions in the event that the red light shines and we do ask that you be mindful of the clock and when your time is about to expire. But in the event that your time expires and you're answering a question from the court, please feel free to finish your answer. If you have rebuttal time, you won't eat into it, but do be mindful of the clock. Our first case this morning is United States v. Pate. Mr. Samuel. Good morning, Your Honor. I assume my audio is okay. Excellent, excellent. Thank you. May it please the court, my name is Don Samuel. I practice law here in Atlanta and I was not trial counsel for Ms. Pate, but I did appear at sentencing and am now her appellate counsel. Ms. Pate was the owner of a company known as Southern Respiratory, which was a durable medical equipment supplier. As far as this case is concerned, primarily the company supplied wheelchairs to patients. These wheelchairs were always required or requested by a treating physician. The treating physician would designate the type wheelchair that was needed, as well as any accessories such as brakes or extra padding or something like that. Some wheelchairs are considerably more expensive than others. For example, for someone who's very heavy, they need a heavier weight wheelchair. The allegations in this case are that Ms. Pate would order from Medicare the correct wheelchair, but bill Medicare, excuse me, would supply the correct kind of wheelchair, but would bill Medicare for a more expensive wheelchair or more accessories, thus increasing substantially her profit. She was indicted in the Southern District of Georgia and charged with healthcare fraud. And because of the use of forged doctor signatures when the company was audited, she was also charged with aggravated identity theft. We've raised a number of issues dealing with both the trial evidence issues, as well as two sentencing issues. The first issue I'd like to address with the court's permission involves the exclusion of a document that the defense considered to be essential evidence in challenging the credibility of the key prosecution witness, a woman named Ms. Merck Harrison. Counsel, let me ask you this. The letter was read in its entirety to the jury, was it not? It was. I'm sorry, trial counsel was allowed to cross-examine the witness in addition to reading the letter, correct? Yes, on page 450 of the record, the trial counsel requested that the court allow the document to be introduced in evidence. Right, so what we're talking about here is simply, it is not excluding the evidence, but simply the form in which it was admitted. It was read verbatim. It was read verbatim. And the witness was cross-examined at some length about it. Well, a page or two, yes. It's on page 450 of the record. At some length, yes. But my point is the only thing that the district court didn't allow, the judge didn't allow counsel to do is put the letter into evidence so it would go back with the jury. Your honor, it was not allowed to be published to the jury. The jury was not allowed to see the document. And as you say, the court also prohibited the document from being introduced in evidence and going out with the jury during deliberations for their consideration. Why is that harmful? Well, this wasn't some insignificant document, your honor. This was the most important part of the cross-examination of this witness, whose testimony was really devastating, to put it bluntly, to the defendant. She was the one who was actually forging all the documents. They called it the arts and crafts process of forging doctor's signatures. So she wasn't the only one who forged doctor's signatures. She was the principal one. And I think even the government in its brief acknowledges that she was a key witness for the government. And this document established a motive for why she would lie and why she would have pinned the blame on Ms. Paik, because she was in attempting to start a new company. She minimized it during the testimony. She minimized, this was just a dream I had of starting a new company. But in fact, she and another employee were starting a new company, were making allegations against Ms. Paik, trying to encourage doctors to use her service, her new company that she was going to form, even had a trial counsel was permitted to read it one time to the jury over objection from the government. But unlike all the government, you know, when the government wants to introduce evidence, they're not told, well, you can read it, but you can't put a document in. They weren't. Well, so you don't know that that's always the rule, counsel. I mean, what we've got here is the letter was read. I assume he read it at his own pace to the jury. Can't tell from our church. I have cross examined the witness about it. He was given a full and fair opportunity to do that. And then he argued in closing argument. It's not a complicated multi-page letter. How many pages? It's it's really quite short, Your Honor. It's one paragraph. Yeah, that's what I thought. So so there's no reason to believe the jury wasn't fully aware of your honor. I can't argue with you the fact that the jury heard the contents of the letter, but the government also can't argue that that the document was a critical document to impeach the witness. It was that they have it out with the jury to be able to display it to the jury, to show it to the jury. I'm having a hard time how it really does that. I mean, it certainly suggests, you know, makes clear that the letter writer wanted to start a new business. Correct. But as I understand it, the business never really got on off the ground. Right. Well, that would have been subsequent to the writing of the letter. The point, of course, but that's that's what ended up happening. And the jury was told that that's what she wanted to do. She admitted there's no real dispute. That's what she wanted to do. Right. Well, she minimized it. She said that we had a dream of starting a new company, but this showed that it was actually well in progress and that and that that's why she was going to test. That's why this was the theory of how does it show that? Because it says is I'm brought to the attention of the office of the inspector general. She says I'll no longer be working at Southern Respiratory. I look forward to working with you in the near future with Delta Medical Equipment. Right. That's it. Right. The theory of the defense was that she was trying to steal the business from Southern Respiratory. And the jury heard it. Well, then we're back to the harmless error issue, as opposed to whether it's relevant. It's clearly relevant. It's clearly, you know, it wasn't hearsay, which was the government's theory at trial, that it shouldn't be that it should be excluded entirely, that it shouldn't be used. And the judge kind of compromised and said, well, I think it is hearsay, though it clearly wasn't. It wasn't often. Why wasn't it? I mean, it's being introduced to prove the truth that the matter asserted that she was leaving to start a new business venture. Well, the first sentence is the accusation that Ms. Pate was engaged in unethical business practices, which obviously was not the intention of the defense to to present that as a truthful matter, the exact opposite of what the defense. It was shown the document was being used to. But I thought your theory was the reason you needed this letter was to show her motive. And that is that she was well underway and starting a new business. So it seems to me that the that the portion of the letter that goes to that is the last part of it. I look forward to working with you in the near future with Delta Medical Equipment. And and and so what you're saying is you were introducing it to prove the truth of the matter asserted. We're not trying to prove that she's looking forward. We're trying to prove that this was that this was in progress, that she was making false accusations against Ms. Pate. That was the theory. She's making false accusations against Ms. Pate. You should stop doing business with her and come to do business with me. And and that was her reason for them. And that is all part and parcel of what the defense theory was, was her motive to lie. And it's it's critical under the Sixth Amendment to be able to be witness. I don't know if we have any other questions about that issue. If you want to stay on it, you certainly can. And if you have another issue you wanted to get to, you only have a little time left. I understand that, Your Honor. We we have raised the issue of the impropriety of introducing evidence of how Ms. Pate spent money. The issue, this is an issue that arises frequently in in fraud cases. This was a subject of motions in limine ahead of trial. That seems to be classic motive evidence to me. Well, but that unless the court were going to say that in every single case involving an economic crime, the government can introduce evidence that the defendant bought a watch or the defendant bought a necklace. There's no proof. It's the counts. It's the Rolex exception to that rule. I haven't seen that rule in the 400 series of the evidence rules. It's not that they bought a watch. It's they bought a very expensive watch, two very expensive diamonds, a car, paying cash and so forth and so on. Well, well, I understand, Your Honor. But but still that this court and the Bradley decision, which we've cited, has said that unless it is relevant to the actual crime that was committed, it's not admissible to prove, you know, to prove, you know, either the motive. Everybody spends money. She owned this company. She made a lot of money legitimately. And to try to exploit the fact that she buys jewelry or buys, you know, an ATV for her son's birthday is hardly evidence that she committed the crime. Your Honor, can I raise one more issue that I got a minute? I got a minute. We have raised two sentencing issues, sophisticated means and which we've briefed at I don't want to read. OK, you want to point out, though, very much that Judge Carnes, of course, 16 years ago, wrote a concurring opinion in which she said if which he said, if the court were to indicate that the sentence wouldn't be any different, regardless of the guideline calculation, then it might it might be harmless error. I did not point that out in my brief. The government didn't raise that in its brief. But Judge Hall did make that observation. We would ask the court and discuss this a little bit in rebuttal not to invoke that rule here because of the dramatic difference. If we were to win the two guideline issues, the dramatic difference in the guideline calculation. And we would ask the court not to invoke that harmless error doctrine in this case. Thank you. OK, thank you, Mr. Samuel. You've saved a few minutes for rebuttal. Mr. Is it Davids? Davids. Thank you, Your Honors. May it please the court. My name is Justin Davids, and I'm an assistant U.S. attorney in the Southern District of Georgia, and I represent the Appellee of the United States of America. Your Honors, I guess to I'll start with the wealth evidence issue just briefly. And I think that in this case, I think that the 11th Circuit's case law is pretty clear that wealth evidence is evaluated under Rules 401 and 403, and it's a balancing test. And in the lower court, the defendant agreed with this. Their arguments below focused especially on the 403 balancing. On appeal, they cite the Sixth Circuit test, which involves showing that the money somehow actually derived from the fraudulent conduct before it can be entered in as wealth evidence. The government believes that the the 11th Circuit's approach is more flexible. It's more consistent with Rule 403B evidence, which is exclusion under 403 is a pretty rare event. You know, evidence is presumed to be admissible. And the 11th Circuit's precedent provides district courts that flexibility in evaluating the specific facts of a case and determining whether it's appropriate to enter it. And so in this case, the wealth evidence was relevant for several reasons. It was relevant and probative for motive in this case. The defendant was the person that had the incentive to maximize profit for Southern Respiratory. They personally benefited from that profit. It rebuts one of the defenses in this case, which was that other people were responsible for the fraud, not the defendant. Because again, it shows that she personally benefited from the proceeds of this fraud. It's somewhat intrinsic to the crime and that it completes the story. It shows where the money ended up going. And I would say that even if you know, the court were to consider something like the Sixth Circuit's approach, which again, I think is a little too restrictive. Here, we sort of still have that we the evidence showed that almost a million dollars was paid by and it went into the Southern Respiratory Bank account. And the money to purchase these, the jewelry and the ATV came out of the Southern Respiratory Bank account. So in that sense, once we're dealing with commingled funds, it's a little more unreasonable to say that you have to show that that dollar actually came from the fraud. Um, so, Your Honors, you know, I think that, you know, and then finally, we have the harmless error analysis that, you know, even, even if it were improperly admitted that the evidence here of the defendant's involvement in Medicare fraud was fairly overwhelming, and it did not have a substantial impact on on the jury's verdict. To go to the sentencing issues. And, and I'm thankful that Mr. Samuel brought this up because I too, I agree, I had missed the issue of the district court acknowledging that at the end of sentencing that based upon the 3553A factors, uh, it would have imposed the same sentence, even if it hadn't, uh, it hadn't imposed the, the sentencing guidelines enhancements. And, uh, I apologize for, for missing that issue. But it does go to this court's assumed harmless error analysis. And as part of that analysis, the court will still affirm a judgment if the sentence remains substantively reasonable. And, you know, appellant asked the court to essentially, you know, not not apply that analysis in the sense that he says that there's a dramatic difference. Um, and I think that really goes to the reasonableness of the sentence. And that's under an abuse of discretion standard. Uh, Judge Hall and his it's around, uh, I believe page 148 to 150 of the sentencing transcript goes through his, uh, 3553A analysis, uh, explaining why he would impose the same sentence. And, um, you know, I think that it's even if those sentencing enhancements did not apply, that the court could still consider the conduct related to those sentence, the, that, uh, those sentencing enhancements to vary above the guideline range. Um, and in this case, it'd be about, if, if neither one of the sentencing enhancements were applied, it'd be a 19 months upward variance. Uh, if one of the sentencing enhancements were implied or applied, the sentence would be at the high end of that guideline range. It'd still be a guideline range sentence, but it'd be at the high end. And so, uh, you know, some of those 3553A factors were that the defendant personally involved herself in the fraudulent conduct by going into this bright tree system, changing, uh, the wheelchair orders, uh, changing equipment orders. And then, uh, in order to avoid being caught when these Medicare submitted audits, a request to her, uh, she involved her employees. She instructed them to assist her with the fraud. Uh, she instructed them to forge doctor signatures. She engaged in some forgery herself. And, uh, the court also believed that, you know, Medicare is a program that's meant to help older citizens. And so stealing from this program is a particularly egregious act that cannot be tolerated. Mr. Davis, with regard to the sophisticated means enhancement, can you tell me how her use of the computer was sophisticated? Uh, your Honor, the use of the computer itself, I mean, it was, she had to understand how the Medicare accepts, uh, those, uh, submissions in order to know how to, uh, change it in a way that would cause Medicare to reimburse her for costs. I think that, uh, if we're talking about the, uh, the enhancement itself, I think we have to look though, at the totality of the circumstances. It's not just her use of the computer that results in this, in the sophisticated means enhancement in this case. I agree that we have, yes, we do have to look at the totality, but, um, you know, the listed factors are use of the computer, use of alter ego companies, holding companies, things like that. And I don't see this here, here, she, uh, conscripted her employees to assist her with cover up the fraud, but I'm not sure that rises to the level of sophistication. Well, I think the, in U.S. V Manjano, the 11th circuit is described that it's repetitive coordinated conduct to perpetrate and conceal fraud that supports the enhancement. And interestingly in Manjano, the 11th circuit quoted the district court with some approval. And the district court has described that Medicare fraud is sophisticated by its very nature because the participants have to do numerous things just right. And so here, it was not only the use of the computer, but it was then the repetitive coordinated conduct with her employees over the course of two plus years, which indicates some sophistication, uh, to avoid detection, uh, to avoid being, uh, through these Medicare audits being detect to avoid being detected, uh, the fraud, um, and, uh, you know, that supports the enhancement. You know, I think there are also some concealment there. Uh, yes. Uh, the, the use of the, uh, doctor's signatures, uh, goes to part of the concealment. Uh, uh, I thought there was some shredding of evidence too. There was some shredding of evidence too. Um, that, uh, as, uh, the appellant mentions this, this arts and craft box was, uh, essentially a box where they kept scraps and some of them were eventually, you know, shredded and, uh, others were, you know, hadn't been yet shredded, but were, uh, anticipated to be done later is my understanding. Is this a finding of fact? Yes, it's a clear standard. And so, uh, and to just briefly, uh, address some of the cases that, uh, appellant sites, the cases, the middle district of Alabama case, Hulse, uh, sites, uh, an 11th circuit case, Mendez, and I believe that at best for appellant, uh, they're in a posit. At worst for appellant, they actually support the government's position. Uh, so in Mendez, uh, the court there observed that, uh, in each case where the application of the sophisticated means enhancement had a bit been, uh, upheld the defendant used false identities to conceal, uh, his participation or to con to execute and conceal the fraudulent transactions. Well, that's what we have here. We have, uh, the defendant using, uh, false identities to help conceal the fraud. So, uh, Mendez, uh, really supports the enhancement being used in this case. Uh, Hulse, uh, the district court, uh, actually found that there were no false identities used. That was one of the reasons, uh, it felt that the sophisticated means enhancement shouldn't apply that the defendants in that case, uh, were getting fraudulent loans and they were using their own names. It was going into bank accounts with their own names. Uh, and the district court also found that there was no concealment. And so, uh, factually Hulse, uh, demonstrates, uh, a very case than what we have here. So, uh, based on that, I, I think that even, even if, you know, we go, uh, we don't go into the reasonableness of the sentence or, or if the court were to find that otherwise the, the sentence were unreasonable, that, uh, the sentence enhancement was, uh, there was no clear error in, uh, applying the sentencing enhancement. Counsel, why did the, uh, judge let defense counsel read the letter to the jury and cross examine the witness about it, but wouldn't allow the letter to go to the jury? I, I think that the court had some concerns about the hearsay aspect of the letter, particularly because, uh, it was not a letter written by the witness. That doesn't explain why you would let counsel read the letter in full to the jury, hearsay and all, if any. Your honor, I agree. I, you know, I think that, uh, the trial judge, uh, has incredible discretion in allowing, uh, defendants to engage in effective cross examination, uh, by any means they want to, but, uh, the district court has broad discretion in allowing district courts to, uh, allow defendants to engage in effective cross examination. Seems to me, Mr. David, Mr. David's that Mr. Samuel had pretty good argument that it actually wasn't hearsay. It wasn't being introduced to prove the truth of the matter asserted because it wasn't being introduced to prove that she looked forward to working, uh, with her former customers, uh, at, at the new business. It was actually to show something else. Sure. I think there are two aspects of the letter, like the, there's, uh, the aspect of the letter where they talk about the fraud. And of course that the defendant does not want to, uh, enter that into the evidence for that purpose is the opposite. Right. And the, the part of the letter that they wanted to enter in for the truth of the matter is that, that, uh, the witness and the writer of the letter, uh, Kim Kimberly Grotz, I think was her name. Um, we're going to start this business. Um, that's the truth of the matter. Uh, I do think though that, uh, you know, arguably the, uh, the court could allow it in, uh, at least, uh, to be cross examined. Your better argument is harmless error. It's harmless error. I think that it's also, uh, that again, the court has this broad discretion on admitting evidence and it's effective cross examination, not effective cross examination by any means you want. Okay. Uh, Mr. David, so your time is up. Um, we appreciate your argument, Mr. Samuel, you've got three minutes. Thank you, Ron. You know, with regard to the, um, expenditure of money issue, you know, the government's argument is you can introduce whatever evidence you want to show, um, that she um, and of course that's the income part of it. And, and so the government was able to do that by showing the amount of money that Medicare paid into the company. And then, you know, eventually to her, she's the owner of the company, but why does that allow the government to introduce evidence that she bought birthday presents for her son and ATV or, or the, um, the Rolex watch or the, the necklace, the point of showing in white collar cases, lavish spending by defendant is often introduced to prove motive. Well, isn't that just a common occurrence? I don't know that it's common. And I don't know that it's right. The point that in order to show greed, right. In order to show that you're the perpetrator or the motive is that you received money with the, with the court also have allowed hypothetically Ms. Pate to introduce evidence that she gave money to charity, that she gave money to orphanages in, in, in, in Africa for, you know, for orphans. Sure. I mean, suppose she had given a half million dollars to, uh, mother Teresa's orphanage. That would have been admissible. Well, it doesn't prove anything though. She had a half million dollars in the desire to spend it. The money's already been proven. The income has proven already how you spend the money. Doesn't prove that you're the perpetrator of the offense. If, if I give an examples in my brief, if you're a drug dealer and you need the money to buy drugs, then, then you can use it to show that you, you know, that you're the perpetrator, that you had a motive, but whether you give the money to mother Teresa or give the motive, it just shows you have access to money. That's already been proven by the receipt of the money by the company. It doesn't add anything other than prejudice the defendant by virtue of the fact that she bought a Rolex watch. I don't see how that adds to the... Well, if, if you've got the receipt of the money, but to show its profit, you've got to be able to spend it. If the Dural medical goods cost $950,000 and she had taken in a million dollars in funds from the customers, that's one thing, but taking in enough money to buy new cars, two diamonds, Rolex, and so forth and so on, after you've taken in the money and gotten the profit out of it is a different thing. I'm not, I, I've said I've run out of time, Judge. I'm not quite sure I understand. The receipt of the money was a given. There's no doubt she received the money. Whether she spends it on mother Teresa or on a car doesn't change the amount. I think the difference that my question saw unsuccessfully to point out is there's a difference between receiving gross proceeds of a sale of durable medical equipment, having obtained a huge profit from the operation of the business because you weren't paying on the front end for the goods that you were charging for on the back end. Lavish spending shows inordinate profit, which is indicative of fraud. Not necessarily requires it, but it is indicative of it. That was my question to you. There's a question mark at the end of that. Well, I'm well past my time, Your Honor. You can take a half minute. Okay, Your Honor, I would only respond by saying that the, the, whether you spend money on jewelry or on mother Teresa doesn't change the amount of money that you received. The, you know, to just say that you bought a watch over the course of two years or an ATV, even the jewelry said this was normal expenditures for her over the years, doesn't establish that she is the perpetrator or that there was a motive for committing the crime. Okay. Thank you, Mr. Samuel. I think we have your case and we'll move to the next one this morning.